**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BARBARA M. CASEY, | |
| Plaintiff, | |
| v. | Civil Action No. 11-0441 (BAH) |
| | Judge Beryl A. Howell |
| RAY MABUS, | |
| Defendant. | |

## MEMORANDUM OPINION

The Plaintiff Barbara M. Casey, an African American woman, brings this employment discrimination action against Ray Mabus, Secretary of the Navy, under the doctrine of *respondeat superior*, alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et. seq.*, and the Civil Rights Act of 1991, 42 U.S.C. § 1981. A motion to dismiss the plaintiff's Complaint pursuant to FED. R. CIV. P. 12(b)(6) is pending before the Court.[1] The Court grants the defendant's motion to dismiss for the reasons explained below.

## I. BACKGROUND

On February 23, 2003, the plaintiff began working for the Department of the Navy as a Police Officer, which is a General Schedule ("GS") Grade 6 position within the standard federal government pay scale. Compl. ¶ 9. Approximately five and a half years later, on November 23, 2008, the plaintiff received a promotion to a GS-7 grade Police Officer Instructor position within the Training Division of the Navy Police, where "she was to work with New Police Hires as they

---

[1] The defendant has also moved to dismiss the Complaint pursuant to FED. R. CIV. P. 12(b)(5) because the plaintiff failed to serve the defendant in a timely manner within 120 days of filing the Complaint, as required by Fed. R. Civ. P. 4(m). The Complaint was filed on February 25, 2011 but was not served until July 16, 2011, eleven days after the 120-day period for service had elapsed. The plaintiff seeks to have the untimely service excused due to her counsel "inadvertently miscalendar[ing] the original service deadline." Mem. of P&A in Supp. of Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n Mem.") at 5, (citing *Rucker v. Architect of the Capitol*, No. 08-cv-0767, 2012 WL 2368865 (D.D.C. June 25, 2012)), ECF No. 6-1. Since the pending motion to dismiss is resolved on other grounds, the Court need not address the merits of defendant's motion on grounds of untimely service.

reported to the command." *Id.* ¶¶ 9, 11.  Following her promotion, the plaintiff received direct orders from Chief of Police Larry Graves, an African American male. *Id.* ¶ 11.

At the time of her promotion, the plaintiff was certified in many areas but had not yet obtained Firearms Instructor Certification, Instructors School Certification, or Navy Instructor Certification. *Id.* ¶ 10.  Until the plaintiff obtained the missing certifications, she was instructed by Chief Graves to assist Training Department supervisors Lieutenant Richard Leon (a Hispanic male) and Lieutenant William Shively (an African American male) with trainings in the areas in which she was certified. *Id.*

The plaintiff alleges that while she worked under supervisors Lt. Leon and Lt. Shively, they "repeatedly planned and conducted training and did not include [her] in the planning process or the actual training of police officers" despite the fact that she was "a new instructor in that division" and was "certified to teach some of those courses." *Id.*  She states that in July and August 2009 she requested "the training needed to acquire the missing certifications" but was never provided with such training. *Id.*  Plaintiff also states that she "requested to attend training at the Federal Law Enforcement Training Center," which she alleges was "noted as 'required' for male officers of lesser rank." *Id.*

On August 28, 2009, while working under Lts. Leon and Shively, Security Officer Richard Sypher—a Caucasian male and a supervisor of the plaintiff—informed the plaintiff that she was responsible for ensuring that Naval Support Activity ("NSA") North Potomac (a group of Naval installations in the Washington, D.C. area) "continued to lead the region in training compliance." *Id.* ¶ 12.  Shortly thereafter, on September 4, 2009, Chief Graves and Officer Sypher informed the plaintiff that "she would be overseeing the Training Department because Lt. Leon and Lt. Shively had been promoted." *Id.* ¶ 13.  The plaintiff claims that at that time she

presented Chief Graves and Officer Sypher with reports demonstrating the training deficiencies in the department that existed prior to her promotion to Police Officer Instructor and presented "a future training schedule that would alleviate these deficiencies." *Id.* The plaintiff requested access to a training laptop and personnel assistance from NSA North Potomac, but alleges that she never received "the necessary equipment or assistance . . . to properly and successfully conduct" training courses. *Id.* The plaintiff, however, was provided personnel assistance for her first training courses in September 2009 from Sergeant Timothy May, an African American male instructor from NSA Washington. *Id* ¶ 14.

In October 2009, the plaintiff again requested assistance from Sgt. May regarding upcoming training courses. *Id.* ¶ 15. The plaintiff alleges that Officer Sypher responded to this request "in a demeaning manner, suggesting that she was 'confused' as to how NSA North Potomac was to interact with NSA Washington." *Id.* Although the plaintiff was not provided assistance from Sgt. May, she was provided assistance from James Williams, an officer from outside the command. *Id.*

On November 19, 2009, Chief Graves informed the plaintiff that, effective December 6, 2009, she would be reassigned to "A-Squad as a Field Supervisor, a position that is lateral to her position as a Police Officer Instructor," where she would be working during the daytime shift. *Id.* ¶¶ 16, 33. The plaintiff alleges that she was not given an explanation for the transfer, and that, as a result of this change, she "would be returning to the same or similar shift work," entailing duties that were "the same or similar to the duties of the position [she] was in prior to her promotion" to Police Officer Instructor. *Id.* According to the plaintiff, although "the Field Supervisor position provided [her] with some supervisory responsibilities, the division and position were less prestigious, the position did not provide [her] with the opportunity to utilize all

of the teaching certifications she had received, and the position provided her with less professional growth and fewer opportunities for career advancement." *Id.* ¶ 16.

The day after being informed of her reassignment, on November 20, 2009, the plaintiff contacted the Department of the Navy's Equal Employment Opportunity ("EEO") office to initiate counseling. *Id.* ¶¶ 6, 17. Ten days later, on November 30, 2009, the plaintiff submitted a letter of hardship to Chief Graves explaining that "the sudden change in her job title and responsibilities, and the sudden change in her work schedule were the cause of great stress for [her]." *Id.* ¶ 18. Additionally, the letter explained that "her sudden reassignment to A-Squad daytime shift would cause her family extreme hardship," noting that her reassignment would make it difficult for her and her husband to transport their daughter to and from school. *Id*. In response to this letter, on December 7, 2009, Chief Graves informed the plaintiff that, to address the concerns she expressed in her letter of hardship, she would be reassigned to the A-Squad midnight shift, instead of the day shift, effective December 20, 2009. *Id.* ¶ 20.

The plaintiff alleges that, after initiating EEO counseling and questioning her reassignment, the plaintiff met with both Chief Graves and Officer Sypher and was told by Officer Sypher that "the Training Division was not satisfied with her training numbers." *Id.* ¶ 19. The plaintiff alleges there had been no prior dissatisfaction expressed within the Training Division about her work performance and that, despite his misgivings stated in the meeting, Officer Sypher offered to put a statement in writing that emphasized "she was a good worker and was indispensable to the command." *Id.* In a meeting with the plaintiff on December 7, 2009, however, Officer Sypher denied making this offer and allegedly threatened the plaintiff "by stating in a loud and aggressive manner," while "slam[ing] his hands on the desk," that "if he

were to put any statements in writing, those statements would include an evaluation that would lead to a demotion." *Id.* ¶ 21.

Three months following this encounter and her reassignment, on March 10, 2010, the plaintiff filed a formal complaint with the EEO, which was dismissed on November 4, 2010, and the plaintiff received notice of the dismissal on November 29, 2010. *Id.* ¶ 6. The plaintiff then filed the Complaint in the instant case on February 25, 2011, within 90 days of receipt of the Final Agency Decision. *Id.*; *see* 42 U.S.C. § 2000e-16(c).

The plaintiff alleges, in three counts, that the conduct of the Department of the Navy employees violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et. seq.*, and the Civil Rights Act of 1991, 42 U.S.C. § 1981. The plaintiff specifically asserts that the defendant engaged in race and gender discrimination (Count I), created a hostile work environment (Count II), and improperly retaliated against her for initiating contact with the EEO (Count III). *See* Compl. ¶¶ 1, 23–49. She seeks, *inter alia*, lost wages, compensatory damages, attorney fees, and declaratory and injunctive relief. *See id.* at 13.

Pending before the Court is the defendant's motion to dismiss the Complaint under FED. R. CIV. P. 12(b)(6). Upon consideration of this motion, and as explained below, the Court agrees that the plaintiff has failed to adequately state claims of race and gender discrimination, hostile work environment, or retaliation. Consequently, the defendant's motion to dismiss is granted, and the plaintiff's Complaint is dismissed.

## II. DISCUSSION

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007); *see also* FED. R. CIV. P. 12(b)(6).  "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).  Instead, the complaint must plead facts that are more than "'merely consistent with' a defendant's liability"; "the plaintiff [must] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557); *accord Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  The Court "must assume all the allegations in the complaint are true (even if doubtful in fact) . . . [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008) (citations and internal quotation marks omitted).

The defendant primarily argues that the plaintiff's Complaint should be dismissed for two reasons.  First, the defendant argues that the plaintiff has failed to allege a cognizable "adverse employment action" with respect to her disparate treatment and retaliation claims.  Def.'s Mot. to Dismiss ("Def.'s Mem.") at 5–13, 15–16, ECF No. 4.  Second, the defendant argues that the plaintiff has failed to allege facts that would elevate her workplace treatment to the level of a "hostile work environment." *Id.* at 13–14.  The Court agrees and as a result grants the defendant's motion to dismiss the Complaint.

### A. <u>Adverse Employment Action</u>

Title VII of the Civil Rights Act makes it unlawful for an employer to discriminate against any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Under Title VII, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the

plaintiff's race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *accord Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).

An "adverse employment action" is "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011) (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)); *see also Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003) ("[An] [a]dverse employment action . . . . [entails a] tangible employment action evidenced by firing, failing to promote, a considerable change in benefits, or reassignment with significantly different responsibilities."). An adverse employment action occurs if an employee "experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1311 (D.C. Cir. 2002).

"'[N]ot everything that makes an employee unhappy," however, "is an actionable adverse action.'" *Baird*, 662 F.3d. at 1250 (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)). Courts have routinely recognized the difference between "purely subjective injuries" on the one hand and "objectively tangible harm" on the other. *See, e.g., Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (internal quotation marks omitted). Because adverse employment actions must be "significant" and entail "objectively tangible harm," the Supreme Court has recognized that "in most cases [adverse employment actions] inflict[] *direct* economic harm." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998) (emphasis added). As a result, "[c]ourts applying Title VII have consistently focused on 'ultimate employment decisions

such as hiring, granting leave, discharging, promoting, and compensating . . . [and not] interlocutory or mediate decisions having no immediate effect upon employment conditions.'" *Taylor v. FDIC*, 132 F.3d 753, 764 (D.C. Cir. 1997).

      1.   <u>Disparate Treatment (Race and Gender Discrimination)</u>

The plaintiff alleges in Count I of the Complaint that the defendant discriminated against her because of her race and gender in violation of Title VII. In an attempt to adequately plead the elements of this claim, the plaintiff alleges that she suffered several adverse employment actions at the hands of the defendant. In particular, she alleges that she was: (1) "denied training that was mandatory for males"; (2) "exclu[ded] from participation in planning training courses and exclu[ded] from assisting with or teaching training courses"; (3) "denied equipment that was essential to the optimal functioning of her position [and] denied assistance that was necessary to properly train officers"; (4) "accus[ed] of responsibility for low training numbers" and as a result "transferred to a less prestigious position and to a shift that had fewer opportunities for career growth and career enhancement" and (5) faced "demeaning treatment and threat of demotion" from her superiors. Compl. ¶¶ 10, 13, 15, 16, 26, 33; Pl.'s Opp'n Mem. at 8. As discussed below, the Court finds that, assuming the truth of these allegations, none of them qualifies—individually or in combination—as an "adverse employment action" under Title VII.

      a.  *Denial of Training Opportunities*

The Complaint alleges that the plaintiff was denied instructor certification training, including a class that was "noted as 'required' for males of lesser rank." Compl. ¶¶ 10, 26. The mere denial of training opportunities, however, does not constitute an adverse employment action. *Dorns v. Geithner*, 692 F. Supp. 2d 119, 133 (D.D.C. 2010) (denial of the plaintiff's request to attend four training courses was not an adverse employment action); *Lester v. Natsios,*

290 F. Supp. 2d 11, 29 (D.D.C. 2003) (denial of training not an adverse employment action where it did not "affect[] some material change in her employment conditions, status or benefits"). To rise to the level of an adverse employment action, the denial of a training opportunity must result in an objectively tangible harm. *Edwards v. EPA,* 456 F. Supp. 2d 72, 86 (D.D.C. 2006) ("[T]o be adverse, the denial of a travel or training opportunity must have a discernible, as opposed to a speculative, effect on the terms, conditions, or privileges of one's employment.").

The plaintiff's allegations regarding denial of training are simply insufficient to establish an adverse employment action. She avers that the training would have enabled her more fully to carry out her duties as a Police Officer Instructor and would have increased her potential for career advancement, Compl. ¶ 26, but this is pure speculation. Although it is logical in the abstract to think that more training results in higher quality work and better career opportunities, the plaintiff alleges no facts to demonstrate how these added trainings would have materially affected her employment. Likewise, even assuming that the denial of training opportunities made the plaintiff a suboptimal worker, such denial is still not an "adverse employment action" under Title VII absent some concrete factual allegation that her training deficit imposed a tangible harm on the terms, conditions, or privileges of her employment. Such allegations are wholly lacking in the plaintiff's Complaint. To the contrary, the plaintiff admits that she was promoted to a higher grade as Police Officer Instructor with the Training Division despite the fact that her direct supervisor knew that she lacked the certifications for which she requested training. Compl. ¶¶ 9, 10. Although the plaintiff's allegations regarding the denial of training opportunities are "conceivable," they lack the requisite factual content to render them "plausible," and thus they are insufficient. *See Twombly*, 550 U.S. at 570.

b. *Exclusion from Planning and Conducting Training Courses*

The Complaint also alleges that the plaintiff was excluded from participating in the planning of training courses and from assisting with or teaching such training courses. Compl. ¶ 26. The plaintiff has failed to allege any specific meetings from which she was excluded and, more importantly, has failed to articulate any objectively tangible harm she suffered by being excluded from the planning or implementation of training courses. *Compare Hayslett v. Perry,* 332 F. Supp. 2d 93, 105 (D.D.C. 2004) (no adverse employment action where plaintiff neither specified meetings nor demonstrated how the exclusion from meetings caused her any harm), *with Allen v. Napolitano*, 774 F. Supp. 2d 186, 199–200 (D.D.C. 2011) (finding adverse employment action based on exclusion from meetings where plaintiff "was deprived of information critical to her duties" which "interfered with her job performance"). *See also Johnson v. Bolden,* 699 F. Supp. 2d 295, 300 (D.D.C. 2010) (plaintiff's complaints about exclusion from meetings did not "amount to more than general dissatisfaction with his job").

Here, the Complaint contains no allegations from which a reasonable inference can be drawn that plaintiff should have been included in the meetings or that the plaintiff's exclusion materially changed her employment conditions, status, or benefits. As a result, these allegations also fail to establish an adverse employment action.

c. *Denial of Training Equipment and Personnel Assistance*

The Complaint further alleges that the defendant denied the plaintiff training equipment and personnel assistance needed to conduct training courses properly. Compl. ¶¶ 13, 26. The only such training equipment described in the Complaint is a laptop computer. *Id.* Further, although the plaintiff claims that a lack of personnel assistance prevented her from "properly and successfully conduct[ing]" training courses, she does not allege that she was totally deprived of

requested personnel assistance. *Id.* ¶ 13. On the contrary, she admits that she received personnel assistance from multiple individuals, including Sergeant Timothy May, an instructor from NSA Washington, and James Williams, an officer from outside the command. *Id.* ¶¶ 14, 15. The plaintiff also concedes that she conducted multiple training courses while being assisted by Sergeant May and does not allege how these courses were improperly or unsuccessfully conducted. *Id.* ¶ 14.

Even assuming the truth of these allegations, they cannot form the basis of a Title VII claim. The plaintiff appears to complain essentially that she was not allocated as many resources as she would have liked, but such common workplace shortfalls, without more, are not the kinds of problems that Title VII was intended to remedy. *See Allen*, 774 F. Supp. 2d at 203 (finding denial of additional resources and support is not sufficient to qualify as a material adverse action where plaintiff "could have benefitted" from them); *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 73 (D.D.C. 2007) ("Scarce resources and increased workloads are familiar complaints in virtually every workplace and every industry, but they do not give rise to a discrimination claim under Title VII."). Once again, the Complaint lacks any factual allegations that would support the inference that these denials of resources effected any tangible harm upon the plaintiff's employment. Hence, these allegations likewise do not establish an adverse employment action.

    d. *Accusation of Low Training Numbers and Transfer of Job Position*

The Complaint alleges the plaintiff was wrongfully accused of responsibility for low training numbers when those low training numbers existed prior to her promotion to the Training Division. Compl. ¶ 26. The plaintiff also claims that, as a result of these low training numbers, the plaintiff was transferred to a less prestigious unit and given a less prestigious title that carries fewer supervisory responsibilities and also has fewer opportunities for career growth and

11

promotion. *Id.* ¶¶ 16, 33. Finally, the plaintiff alleges that her non-African American male predecessors in the Training Division were promoted in spite of these low training numbers. *Id.* ¶ 19.

As an initial matter, and as the defendant points out, the plaintiff does not dispute the accuracy of the training numbers but instead alleges that the training deficiencies already existed when she received her promotion. Def.'s Mem. at 9. Although the plaintiff claims that she was unfairly blamed for these numbers, that alone falls far short of an adverse employment action. No employee enjoys taking the blame for others' shortcomings, but enduring "public humiliation" or "loss of reputation" in the workplace—though unfortunate—cannot form the basis of a Title VII claim. *See Holcomb*, 433 F.3d at 902. Even formal, negative performance evaluations are not adverse employment actions absent tangible harm. *See Baloch*, 550 F.3d at 1199 ("[P]erformance reviews typically constitute adverse actions only when attached to financial harms."); *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) ("[F]ormal criticism or poor performance evaluations are [not] necessarily adverse actions and they should not be considered such if they did not affect[] the [employee's] grade or salary." (internal quotation marks omitted)).

The more relevant inquiry is whether the reassignment that resulted from the plaintiff taking the blame for low training numbers qualifies as an adverse employment action. Although the plaintiff alleges that her transferred position entailed "shift work," similar to the kind of work she performed before being promoted and was "less prestigious," Compl. ¶ 16, she also concedes that the transferred position was lateral in nature, had a higher pay scale (GS-7) than her prior "shift work" position (GS-6), and included supervisory responsibilities, *id.* ¶¶ 9, 16, 33. She also fails to allege that the reassignment resulted in any decrease in pay or other benefits.

That being said, courts have recognized that "prestige" is not to be disregarded in addressing whether a job transfer amounts to an adverse employment action. For example, in *Bloom v. McHugh*, the court found that a management team's refusal to provide an employee with a more prestigious job title that was required after an official reassignment could plausibly constitute an adverse employment action. 828 F. Supp. 2d 43, 57–58 (D.D.C. 2011). Notably, however, the court in *Bloom* also found that the allegations of the plaintiff's complaint "plausibly allege[d] that she was denied a title *that confer*[*red*] *a professional benefit*." *Id.* at 57 (emphasis added). Even the most generous reading of the plaintiff's Complaint in this case does not warrant a similar conclusion. Although an objectively less prestigious job title, i.e., one withholding or diminishing a professional benefit, could constitute an adverse employment action, the Complaint is devoid of any factual allegations of this kind. Rather, it appears that the plaintiff's claim that her reassignment was less prestigious is based on her subjective perceptions rather than any objective professional benefit. *See Forkkio v. Tanoue*, 131 F. Supp. 2d 36, 40 (D.D.C. 2001) ("Plaintiff's own belief that the reassignment was a 'demotion' and was accompanied by a loss in stature or prestige is insufficient to render it otherwise."), *aff'd*, 306 F.3d 1127 (D.C. Cir. 2002). The plaintiff's claims that her reassignment had "fewer opportunities for job growth and promotion," unsupported by any factual allegations, are speculative and likewise unavailing. *Edwards*, 456 F. Supp. 2d at 86 (declining to find that a constraint on the opportunity to seek out "potentially fruitful" employment opportunities is an adverse employment action).

The Complaint additionally alleges the sudden change in the plaintiff's work schedule resulting from her reassignment caused her and her family great stress and extreme hardship, leaving her "embarrassed and emotionally drained." Compl. ¶ 18. In particular, she alleges that

her reassignment to a day shift position made it very difficult for her and her husband (also a police officer) to transport their daughter to and from school. *Id.* Even so, the defendant changed the plaintiff's shift to the midnight shift within one week of being notified of her hardship, and the change became effective within two weeks of her reassignment. *Id.* ¶ 20. It cannot be reasonably inferred that this temporary inconvenience rose to the level of a material change in the plaintiff's employment. *See Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) ("[M]inor inconveniences and alteration of job responsibilities [do] not rise to the level of adverse action necessary to support a claim." (internal quotation marks omitted)).

      e.   *Demeaning Treatment and Threats of Demotion*

Finally, the Complaint alleges that the defendant subjected her to "demeaning treatment" when Officer Sypher "threatened plaintiff by stating in a loud and aggressive manner, that if he were to put any statements in writing those statements would include an evaluation that would lead to a demotion." Compl. ¶¶ 21, 26. The Complaint further alleges that Officer Sypher slammed his hands on a desk during this meeting. *Id.* The use of harsh words on a single occasion, even if it amounts to "public humiliation" does not amount to a materially adverse employment action. *See Holcomb*, 433 F.3d at 902. It cannot be reasonably inferred that the alleged "demeaning treatment and threats" resulted in materially adverse consequences affecting the terms, conditions, or privileges of the plaintiff's employment.

  2.   Retaliation

The plaintiff alleges in Count III of the Complaint that the defendant retaliated against her in violation of Title VII. She claims that, after filing a complaint with the EEO, she was "treated with hostility" based on a single incident involving Officer Sypher in which he spoke to

the plaintiff "in a loud and aggressive manner" and "slammed his hands on the desk." Compl. ¶ 46.

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that "'(1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action.'" *Hamilton v. Geithner,* 666 F.3d 1344, 1357 (D.C. Cir. 2012) (quoting *Woodruff v. Peters,* 482 F.3d 521, 529 (D.C. Cir. 2007)); *accord Wiley v. Glassman,* 511 F.3d 151, 155 (D.C. Cir. 2007); *Smith v. District of Columbia,* 430 F.3d 450, 455 (D.C. Cir. 2005).

As to the first element, protected activity encompasses utilizing informal grievance procedures such as complaining to management or human resources about the discriminatory conduct. *Richardson v. Gutierrez,* 477 F. Supp. 2d 22, 27 (D.D.C. 2007) ("It is well settled that Title VII protects informal, as well as formal, complaints of discrimination."). Thus, there is little doubt that the plaintiff's conduct in filing a complaint with the EEO constituted protected activity under Title VII. *Id.*

As to the second element, the Court must evaluate whether the plaintiff suffered an adverse employment action independent of the foregoing analysis regarding disparate treatment claims. This is because adverse actions giving rise to retaliation claims are broader than for disparate treatment claims and are "'not limited to discriminatory actions that affect the terms and conditions of employment,' but reach any harm that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Baird,* 662 F.3d at 1249 (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 64, 68 (2006)). This standard is an objective one, looking to "reactions of a *reasonable* employee" in order to "avoid[] the uncertainties and unfair discrepancies that can plague a judicial effort to determine a

plaintiff's unusual subjective feelings." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68–69 (2006). It should also be noted that, although the standard for adverse employment actions is more lenient with retaliation claims than it is with disparate treatment claims, the Court in *Burlington Northern* nevertheless distinguished "materially adverse" actions from "trivial harms," "petty slights," and "minor annoyances." *Id.* at 68.

It cannot be reasonably inferred that the incident described by the plaintiff can qualify as a materially adverse action for the purposes of a retaliation claim. Notably, the incident alleged by the plaintiff was a single, isolated occurrence that, although likely unpleasant, was not sufficiently severe so as to become materially adverse. *See Baloch*, 550 F.3d at 1199 (finding that multiple, sporadic altercations did not meet "the requisite level of regularity or severity to constitute material adversity for purposes of a retaliation claim"). The fact that this encounter was never repeated and that it did not result in any further ramifications for the plaintiff—such as a reassignment, a pay cut, or other negative action—strongly support the conclusion that the defendant's actions would not dissuade a reasonable employee from supporting a charge of discrimination.

Because the plaintiff does not allege any facts that plausibly imply the existence of any adverse employment actions on the part of the defendant, her claims for disparate treatment and retaliation must fail.

### B. <u>Hostile Work Environment</u>

The plaintiff's only remaining claim is that the defendant created a hostile work environment in violation of Title VII. A plaintiff may establish a violation of Title VII by proving that the employer created or condoned a discriminatorily hostile or abusive environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–67 (1986); *accord Gary v. Long*, 59 F.3d

1391, 1395 (D.C. Cir. 1995). Discrimination in this form occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted); *accord Singletary v. District of Columbia,* 351 F.3d 519, 526 (D.C. Cir. 2003). The Supreme Court in *Harris* explained that assessing whether a hostile work environment exists has both subjective and objective components. Thus, no Title VII violation is present "if the victim does not subjectively perceive the environment to be abusive," or the conduct "is not severe or pervasive enough to create an objectively hostile or abusive work environment." *Harris,* 510 U.S. at 21.

While the subjective test of whether the plaintiff actually found the environment abusive may be readily satisfied in employment discrimination suits, the Supreme Court has acknowledged that the boundaries of what constitutes an objectively discriminatory hostile work environment is not "a mathematically precise test." *Id.* at 22. The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998) (internal quotation marks omitted). This objective test requires examination of the totality of the circumstances, including "the frequency of the discriminatory [or retaliatory] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23.

The Supreme Court has been clear that Title VII does not establish a "general civility code for the American workplace." *Oncale,* 523 U.S. at 80. Indeed, "Title VII does not prohibit

all verbal or physical harassment in the workplace." *Id.*  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" a hostile work environment.  *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted); *see also EEOC v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 315 (4th Cir. 2008) ("[E]ven incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard.  Some rolling with the punches is a fact of workplace life.").  To "[prevent] Title VII from expanding into a general civility code," the Supreme Court has emphasized as "crucial" the requirement that the behavior be "so objectively offensive as to alter the 'conditions' of the victim's employment."  *Oncale,* 523 U.S. at 81; *see also Faragher,* 524 U.S. at 788 ("[C]onduct must be extreme to amount to a change in the terms and conditions of employment . . . .").

The facts alleged to support the plaintiff's hostile work environment claim are essentially identical to those alleged in support of her retaliation and disparate treatment claims.  Namely, the plaintiff alleges that the defendant engaged in behavior that created a hostile work environment when supervising Officer Sypher "stat[ed] in a loud and aggressive manner, that if he were to put any statements in writing, those statements would include an evaluation that would lead to a demotion" while he "slammed his hands on the desk" during a meeting regarding her reassignment.  Compl. ¶¶ 21, 39.  Additionally, the plaintiff alleges that Officer Sypher's "demeaning" response to her request for personnel assistance (suggesting she was "confused"), her "supervisors' subtle discriminatory conduct," and her exclusion from the planning and presentation of training courses by the Training Division supervisors contributed to the hostile work environment.  Pl.'s Opp'n Mem. at 12.  The defendant naturally argues that this conduct falls short of creating a hostile work environment.  Def.'s Mem. at 13–14.  The Court agrees.

Although the conduct alleged by the plaintiff may have been offensive, it cannot be reasonably inferred from the plaintiff's allegations that the defendant's conduct meets the demanding standard articulated by the Supreme Court. Even if taken as true, the supervising officer's "demeaning manner" and loud, aggressive words are neither severe nor pervasive enough to create a hostile work environment. *See Freedman v. MCI Telecomms. Corp.,* 255 F.3d 840, 848–49 (D.C. Cir. 2001) (finding supervisor's "nasty attitude" insufficient to establish a hostile work environment); *Johnson,* 699 F. Supp. 2d at 302 (dismissing hostile work environment claim where plaintiff admitted that supervisor's tone was only "negative," "harsh," "unkind," and "dismissive"). The plaintiff's exclusion from the planning and presentation of training courses were, at best, obnoxious discourtesies and, at worst, manifestations of organizational dysfunction. But in either case, these allegations fall far short of the extreme behavior contemplated by the protections of the hostile work environment doctrine.

### III. CONCLUSION

For the reasons stated above, the Court finds that the plaintiff has failed to state a claim for disparate treatment, retaliation, and hostile work environment. Accordingly, the Court grants the defendant's motion to dismiss the plaintiff's Complaint.

An Order consistent with this Memorandum Opinion shall be entered.

Date: July 20, 2012

                                           /s/ *Beryl A. Howell*
                                           BERYL A. HOWELL
                                           United States District Judge